SCHNADER HARRISON SEGAL & LEWIS LLP
LISA J. RODRIGUEZ
ljrodriguez@schnader.com
Woodland Falls Corporate Park
220 Lake Drive East, Suite 200
Cherry Hill, New Jersey 08002-1165
Telephone: (856) 482-5741

DURIE TANGRI LLP
SONALI D. MAITRA (*Pro Hac Vice to be filed*)
smaitra@durietangri.com
TIMOTHY C. SAULSBURY (*Pro Hac Vice to be filed*)
tsaulsbury@durietangri.com
217 Leidesdorff Street
San Francisco, CA 94111
Telephone: (415) 362-6666
Facsimile: (415) 236-6300

Attorneys for Defendant
FUNAMBOL, INC.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SYNCHRONOSS TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> FUNAMBOL, INC., <br><br> Defendant. | Civil Action No. 3:14-cv-06017-MLC-LHG <br><br> Hon. Mary L. Cooper, U.S.D.J. <br> Hon. Lois H. Goodman, U.S.M.J. <br><br> **DEFENDANT FUNAMBOL, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO SYNCHRONOSS' COMPLAINT FOR PATENT INFRINGEMENT** |

Defendant Funambol, Inc. ("Defendant" or "Funambol") hereby responds to Synchronoss Technologies, Inc.'s ("Synchronoss") Complaint for Patent Infringement ("Complaint") by answering and defending as follows:

## I.   ANSWER

## THE PARTIES[1]

1.      Funambol admits that Synchronoss is a Delaware corporation. Funambol lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in Paragraph 1 of the Complaint and denies them on that basis.

2.      Funambol admits the allegations contained in Paragraph 2 of the Complaint.

3.      Funambol admits the allegations contained in Paragraph 3 of the Complaint.

## JURISDICTION AND VENUE

4.      Funambol admits that this case arises under the patent laws of the United States and that this Court has subject matter jurisdiction.  Except as so expressly admitted, Funambol denies the remaining allegations in this paragraph. In particular, Funambol denies that the asserted patents constitute patentable subject matter under 35 U.S.C. § 101.

---

[1] Funambol neither admits nor denies the contents of the various headings and subheadings in the Complaint, which are reproduced herein solely for convenience.

5.     Funambol denies the allegations contained in Paragraph 5 of the Complaint.

6.     Funambol admits that its website, www.funambol.com, may be accessed in New Jersey and in this judicial district, just as it may be accessed anywhere in the world with an Internet connection.   Except as so expressly admitted, Funambol denies the remaining allegations in this paragraph.   In particular, Funambol denies that it has sufficient contacts with the forum to permit the exercise of personal jurisdiction over it.

## SYNCHRONOSS' PATENTS

7.     Funambol admits that United States Patent No. 6,671,757 (the "'757 patent"), entitled "Data Transfer and Synchronization System," states on its face that it issued on December 30, 2003.  Funambol admits that a copy of the '757 patent was attached to the Complaint as Exhibit A.  Funambol lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in Paragraph 7 of the Complaint and denies them on that basis.

8.     Funambol admits that United States Patent No. 6,757,696 (the "'696 patent"), entitled "Management Server for Synchronization System," states on its face that it issued on June 29, 2004.  Funambol admits that a copy of the '696 patent was attached to the Complaint as Exhibit B.  Funambol lacks knowledge or

information sufficient to form a belief about the truth of the remaining allegations contained in Paragraph 8 of the Complaint and denies them on that basis.

9.    Funambol admits that United States Patent No. 7,587,446 (the "'446 patent"), entitled "Acquisition And Synchronization Of Digital Media To A Personal Information Space," states on its face that it issued on September 8, 2009. Funambol admits that a copy of the '446 patent was attached to the Complaint as Exhibit C.  Funambol lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in Paragraph 9 of the Complaint and denies them on that basis.

## COUNT I—INFRINGEMENT OF THE '757 PATENT

10.    This paragraph does not contain any allegations requiring a response.

11.    Funambol denies the allegations contained in Paragraph 11 of the Complaint.

12.    Funambol denies the allegations contained in Paragraph 12 of the Complaint.

## COUNT II—INFRINGEMENT OF THE '696 PATENT

13.    This paragraph does not contain any allegations requiring a response.

14.    Funambol denies the allegations contained in Paragraph 14 of the Complaint.

15.     Funambol denies the allegations contained in Paragraph 15 of the Complaint.

## COUNT III—INFRINGEMENT OF THE '446 PATENT

16.     This paragraph does not contain any allegations requiring a response.

17.     Funambol denies the allegations contained in Paragraph 17 of the Complaint.

18.     Funambol denies the allegations contained in Paragraph 18 of the Complaint.

## JURY DEMAND

19.     This paragraph does not contain any allegations requiring a response.

## SYNCHRONOSS' PRAYER FOR RELIEF

Funambol denies that Synchronoss is entitled to any relief in any form whatsoever from Funambol and specifically denies that Synchronoss is entitled to any of the relief requested in Synchronoss' prayer for relief. Funambol denies the allegations contained in the prayer for relief.

## II.   AFFIRMATIVE DEFENSES

Funambol alleges the following facts in support of its affirmative defenses:

20.     Founded in 2002, Funambol develops "personal cloud" software that allows users to secure data (such as contacts, calendar entries, media, and documents) from their mobile devices and computers on remote servers, and to synchronize that data across the user's entire range of devices.

21.    Synchronizing such things as contacts, text messages, application data, and media allows users to retrieve their digital belongings if their phone is lost or stolen.  Additionally, with the increased popularity of tablets and employer-provided mobile devices, users often want to synchronize their mobile data across multiple devices; mobile data synchronization services allow users to make a change just once, and have it propagate across multiple devices.

22.    Unlike personal cloud services like Apple's iCloud, Funambol's software is device agnostic and, thus, supports all major operating systems for mobile devices (such as iOS, Android, and Windows) and personal computers (such as Mac OS X and Microsoft Windows).  Funambol licenses its personal cloud software to other businesses, which then apply their own branding when marketing to end-users.  Because Funambol does not put its own branding on the software, the software is referred to as a "white-label" product.  For instance, Funambol licenses its OneMediaHub solution to wireless carriers, who then provide Funambol's personal cloud solutions to their wireless subscribers.

23.    Synchronoss now competes with Funambol in the white-label personal cloud software market.  But until the late 2000's (that is, several years after Funambol's founding), Synchronoss had no presence in the personal cloud business.  The closest was Synchronoss' ConvergenceNow Plus+ product, which

had helped wireless network operators activate new mobile devices on their networks, but it did not provide any personal cloud functionality.

24.    Around 2010, Synchronoss began exploring ways to expand into adjacent markets, including the personal cloud market, and began courting companies with established cloud solutions, including Funambol.  Specifically, in early 2010, Synchronoss approached Funambol to license Funambol's synchronization technology, which Synchronoss would then resell to its customers. When a deal did not materialize, Synchronoss acquired FusionOne (in July 2010)—one of Funambol's main competitors at the time and the original owner of the patents Synchronoss now asserts in this case.  In a press release about the acquisition, Synchronoss reported that FusionOne's personal cloud clients (and thus Synchronoss' newly-acquired slice of the market) included Verizon Wireless, Cellular South, CenturyLink, Bell Mobility, and AT&T.

25.    Shortly after acquiring FusionOne (and its patents), Synchronoss launched a litigation campaign using FusionOne's patents as ammunition.

26.    On January 4, 2011—just a day after perfecting its assignment of the FusionOne patents—Synchronoss sued Dashwire, Inc. ("Dashwire") on the '757, '696, and '446 patents (the "Asserted Patents") in the District Court for the Western District of Wisconsin.  *See Synchronoss Techs., Inc. v. Dashwire, Inc.*, No. 11-cv-02 (D. Wis. 2011).  After Dashwire countered with two of its own

patents, the parties agreed to dismiss the case on August 2, 2011 as part of an apparent settlement. *See id.*, ECF No. 28 (Stipulated Dismissal).

27.     Three weeks later, Synchronoss sued another personal cloud competitor, NewBay Software, Inc. ("NewBay"), asserting infringement of the same patents. *See Synchronoss Techs., Inc. v. NewBay Software, Inc.*, No. 11-cv-4947 (D.N.J. 2011).   Before the court had an opportunity to address any meaningful patent issues—and with Newbay's motions for summary judgment of noninfringement and invalidity pending—Synchronoss announced that it had acquired Newbay.   The following day, the parties stipulated to dismiss Synchronoss' lawsuit. *See id.*, ECF No. 81 (Stipulated Dismissal).   In a press release about the acquisition, Synchronoss reported that Newbay's personal cloud clients (and thus Synchronoss' newly-acquired slice of the market) included Vodafone Group, Orange, Swisscom, and T-Mobile, in Europe; AT&T, T-Mobile, Verizon, and US Cellular in the United States; and LG Electronics and Telstra in Asia.   Through this acquisition, Synchronoss gained more than seventy five-percent of the addressable media- and file-synchronization market in the United States, and roughly fifty-percent of that market in Europe.

28.     During the course of the Newbay litigation, Synchronoss sued another competitor, Vox Mobile, Inc., again alleging infringement of the Asserted Patents. *See Synchronoss Techs., Inc. v. Vox Mobile, Inc.*, No. 11-cv-6713 (D.N.J. 2011).

Just as with Newbay, the parties terminated the case via an agreed dismissal before the court issued any substantive patent rulings.  *See id.*, ECF No. 49 (Stipulated Dismissal).   Two and a half months after that dismissal, on July 14, 2014, Synchronoss announced that it had acquired Vox Mobile's personal cloud affiliate, Voxmobili.   In a press release about the acquisition, Synchronoss reported that Voxmobili's personal cloud clients (and thus Synchronoss' newly-acquired slice of the market) included AT&T, Airtel, Everything Everywhere, France Telecom, Orange, T-Mobile, and Vodaphone.   Through this acquisition, Synchronoss seized nearly fifty-percent of the addressable market for personal information (such as contacts and calendar) synchronization in each of the United States and Europe.

29.    Approximately three months after acquiring Voxmobili, on October 7, 2014, Synchronoss sued yet another competitor, F-Secure Corporation ("F-Secure").  *See Synchronoss Techs., Inc. v. F-Secure Corp.*, No. 14-cv-6220 (D.N.J. 2014).  Because Synchronoss never served the complaint—even after receiving a 90-day extension to do so—Synchronoss, again, avoided any substantive rulings on the Asserted Patents.  Instead, on February 4, 2015, Synchronoss announced that it had acquired F-Secure's personal cloud business.  In a press release, Synchronoss boasted that "[w]ith this acquisition," Synchronoss would "now service over 75 Mobile Operators," which "offer[ed] Synchronoss direct access to

over 3.5 Billion subscribers" worldwide.[2]  Through this acquisition, Synchronoss increased its share of the United States personal information synchronization to nearly eight five-percent of the addressable market.  The following month, Synchronoss moved to dismiss with prejudice its suit against F-Secure.  *See id.*, ECF No. 9.

30.    This suit is just the latest in Synchronoss' pattern of suppressing competition through litigation rather than legitimate competition.  Indeed, despite knowing of Funambol's accused synchronization technology since before it acquired the asserted patents in 2010, Synchronoss did not file suit until more than four years later—and *just days* after Telefónica Spain—one of the world's top five largest wireless network operators—terminated its contract with Synchronoss with the intention of using Funambol in Synchronoss' place.

31.    And, virtually immediately upon filing this suit, it appears that Synchronoss began to use the threat of this litigation to scare off Funambol's customers—customers for whom Synchronoss had tried, but failed, to compete with Funambol on the merits of its products.  For example, just five days after Synchronoss filed this suit, Funambol's largest U.S. customer called Funambol and explained that it had been contacted by one of its existing vendors about this

---

[2]    http://www.synchronoss.com/news/synchronoss-technologies-acquire-f-secure-personal-cloud-assets/

litigation between Synchronoss and Funambol.  On information and belief, that "existing vendor" was Synchronoss.  Over the next several months, the customer sought assurances about the impact of the litigation and whether it may be liable based on its use of Funambol's products.  Despite Funambol's attempts to provide reassurance, the customer ultimately terminated its contract with Funambol.

32.    Notwithstanding Synchronoss' efforts to leverage this suit in the marketplace, Synchronoss' claims against Funambol are meritless on a number of independent grounds.

33.    *First*, since Synchronoss launched its litigation campaign on the Asserted Patents, the Supreme Court's decision in *Alice v. CLS Bank* has drastically altered the legal standards for software patents.  Because each of the Asserted Patents is directed to abstract ideas that are not eligible for patent protection under current law—ideas like "keeping multiple copies of information up to date"—they are invalid as abstract.

34.    *Second*, Synchronoss' claims are barred by FusionOne's (and, thus, Synchronoss') unreasonable delay in bringing suit because, after accusing Funambol of infringing the Asserted Patents nearly *five years ago*, FusionOne retreated from those claims, apparently concluding that they lacked merit—and, at the very least, made Funambol conclude the same as it continued to grow its own business.

35.    For example, by no later than September 2009, FusionOne (and thus Synchronoss) knew that Funambol was selling personal cloud technology that Synchronoss now claims practices the '446 patent.  Indeed, shortly after the '446 patent issued, Funambol was contacted by its customer, Vonage Holdings Corp. ("Vonage") about Funambol's alleged infringement of that patent.  On information and belief, Vonage contacted Funambol because FusionOne had informed Vonage of its allegation that Funambol's personal cloud technology infringed the '446 patent.  Funambol subsequently scheduled a series of calls and in-person meetings with Vonage to explain why it did not infringe the '446 patent.[3]

36.    Then, for nearly five years, FusionOne and Synchronoss slept on their rights to the '446 patent.  At no point during that timeframe did FusionOne or Synchronoss indicate that it would assert the '446 patent against Funambol.  On the contrary, when, in March 2010 (after the Vonage incident), Funambol requested that FusionOne identify any of its intellectual property that may be relevant to Funambol, FusionOne identified other patents, but not the '446 patent. Because FusionOne did not identify the '446 patent, Funambol concluded that FusionOne must have abandoned its claims that Funambol infringed that patent.

---

[3] Vonage's then-Senior Vice President of Product Development and Information Technology, Nick Lazzaro, who participated in a majority of those meetings and calls, is now Synchronoss' Executive Vice President of Strategy & Product Development.

37.     Likewise, by no later than March 3, 2010, FusionOne (and thus Synchronoss) knew that Funambol was selling personal cloud technology that Synchronoss now claims practices the '757 and '696 patents.  Indeed, in February 2010, Synchronoss' litigation counsel in the instant action, Mr. Mark Hogge, sent a letter to Funambol accusing its "Mobile Cloud Sync products" of infringing the '757 and '696 patents.  *See* Ex. A.  FusionOne demanded that "Funambol cease and desist its infringing conduct" and informed Funambol of FusionOne's intent "to seek whatever legal remedies it is entitled to."  *Id*.  On information and belief, Mr. Hogge sent this letter with Synchronoss' knowledge after it had commenced acquisition discussions with FusionOne.

38.     Funambol responded on February 17, 2010 that, "[g]iven the numerous patents referenced in [FusionOne's letter], and the wide-ranging allegations of infringement," Funambol would like FusionOne to explain "why FusionOne believes" the '757 and '696 patents "cover one or more of Funambol's products."  *See* Ex. B.

39.     FusionOne, however, provided no such explanation.  Instead, on March 3, 2010, it simply responded with a list of claims of the '757 and '696 patents that were purportedly relevant to its infringement allegations, but qualified that the list was "not exhaustive."  *See* Ex. C.

40.     Funambol replied on March 16, 2010 and requested that FusionOne provide it with the previously-requested details in the form of claim charts setting forth its infringement allegations.   *See* Ex. D.   Funambol explained that, since FusionOne had apparently already concluded that Funambol infringes, "it should be a simple task to prepare" the requested claim charts.   *Id*.   Funambol expressly informed FusionOne that, if it could not provide the requested information, Funambol would have to "assume that [FusionOne's] allegations lack merit."   *Id*.

41.     Confirming Funambol's suspicions that the claims were meritless, FusionOne *failed to provide any response whatsoever*.   Consistent with its representation to FusionOne (and thus Synchronoss), Funambol was left to assume that FusionOne's claims were without merit.   Consequently, based on FusionOne's and Synchronoss' silence over the next four and a half years—until Synchronoss filed this suit—Funambol was induced to believe that FusionOne and Synchronoss had abandoned their claims that Funambol infringed the '757 and '696 patents.

42.     Indeed, not only did Synchronoss remain silent, but, during that timeframe, Synchronoss licensed *from Funambol* the very personal cloud technology it now claims infringes the Asserted Patents—and thereby further confirmed that it had no intention of enforcing its patents against Funambol. Synchronoss' use of Funambol's technology thus cemented Funambol's belief that Synchronoss had abandoned any claim that Funambol infringed the Asserted

Patents—and, as explained in greater detail below, also bars Synchronoss' claims on additional grounds.

43.    **Third**, Synchronoss' claims are barred by the doctrines of implied license and acquiescence because Synchronoss itself engaged Funambol to develop software that incorporated technology that, on information and belief, is materially identical to that which Synchronoss has accused in this action.  Specifically, in early 2012, Synchronoss approached Funambol about licensing from Funambol personal cloud software that Synchronoss would resell to wireless carriers.  On information and belief, Synchronoss was forced to seek Funambol's help because its prospective wireless carrier clients were unhappy with Synchronoss' own products.

44.    Following a series of detailed business and technical discussions, Synchronoss and Funambol executed a Master Services Agreement (the "Agreement") in May 2012.  Under the Agreement, Funambol licensed the accused OneMediaHub product to Synchronoss so that Synchronoss could resell the product to three of its largest wireless carrier customers.  Pursuant to the arrangement, Funambol provided to Synchronoss its off-the-shelf Android, iOS, PC, and server software, but swapped in Synchronoss and carrier branding in place of Funambol's branding.  Funambol also built customized functionality on top of its existing products based on the requirements of Synchronoss' downstream

customers; however, all of the core synchronization functionality of the software provided by Funambol was materially identical to that of the accused OneMediaHub product—both as it existed then and exists now.

45.    Through the Agreement, Synchronoss became intimately familiar with the architecture and functionality of Funambol's OneMediaHub synchronization software.  In fact, to ensure proper integration with Synchronoss' existing platforms, and that of Synchronoss' wireless carrier customers, the parties held detailed technical meetings—attended by both parties' Chief Technical Officers— wherein they discussed the relevant details of Funambol's synchronization mechanics.  Indeed, Synchronoss sent its engineers to Funambol's offices in Pavia, Italy to work side-by-side with Funambol's engineers, and Funambol's engineers likewise traveled to Synchronoss' facilities to work alongside Synchronoss engineers.

46.    For the next several years, Funambol continued to build and support Synchronoss' deployments of the OneMediaHub product.  During the life of the Agreement—from May 2012 until shortly before filing suit—Synchronoss knowingly acquiesced in Funambol's use of the accused technology without ever alleging that the technology violates Synchronoss' patents.  Indeed, under the Agreement, Synchronoss paid Funambol $500,000 upfront to develop this software, promised millions more in back-end pay (only a few thousand of which

Synchronoss actually paid), learned all the relevant technical details of Funambol's synchronization mechanisms, and happily accepted Funambol's deliverables—all the while mentioning nothing about potential infringement.  Through these actions, Synchronoss made clear its acquiescence in Funambol's use of the accused technology.  Specifically, not once during the engagement did Synchronoss indicate that Funambol may need a license to the Asserted Patents.  Indeed, not until fall 2014—when Synchronoss lost the Telefónica deployment to Funambol, terminated the Agreement, and ceased paying Funambol its revenue shares, and filed this suit—did Synchronoss even suggest that the very technology Synchronoss licensed *from Funambol* required a license to Synchronoss' patents.

47.    Through this and other conduct, Synchronoss led Funambol to believe that it had all necessary permission to use the technology Synchronoss now accuses of infringement, either (1) because Synchronoss had conveyed such permission (*i.e.*, by granting Funambol an implied license); or (2) because Synchronoss, despite knowing of Funambol's use of the technology, stood by without in any way communicating to Funambol that it required additional rights and thus accepted Funambol's use of the technology (*i.e.*, acquiescence).  In short, *how could Funambol possibly think that Synchronoss believed it infringed if Synchronoss was paying Funambol to use the very technology it now accuses of infringement?*  It could not: as a matter of common sense, you would not pay for

something you believe you already own—particularly if you believe that the person you are paying is infringing your technology.

48. ***Fourth***, Synchronoss' claims are barred because FusionOne breached its obligations to the Open Mobile Alliance ("OMA"). In particular, the OMA has established open standards for data synchronization, including the SyncML standard, that Funambol has implemented in the accused products. During the OMA's process for setting the SyncML standard, the OMA required its members to: (1) timely notify the OMA of any intellectual property ("IP") essential to OMA standards; and (2) license any essential IP under fair, reasonable, and nondiscriminatory terms.

49. Timely notice of purportedly essential IP is critical to ensuring that those participating in standards development can evaluate technical proposals with knowledge of the potential licensing costs that suppliers may incur when developing standards-compliant products and services. Likewise, commitments to license any essential IP under fair, reasonable, and nondiscriminatory terms preclude parties making from seeking to halt infringers from practicing the relevant standard with an injunction, and require only that the infringer pay a fair and reasonable royalty. Participants in standards development rely on these commitments to ensure that IP holders seeking to extract unreasonable royalties

and terms from those implementing the standard will not hinder the widespread adoption of the standard.

50.    On information and belief, FusionOne was, at all relevant times, an OMA member and thus was bound by the above commitments.  On information and belief, FusionOne deliberately concealed certain of its intellectual property during the standard-setting process in breach of these (among other) commitments to the OMA.

51.    Based on these breaches, Synchronoss, by its acquisition of FusionOne, is barred from asserting any claims against the Defendants based on the Asserted Patents.  And, to the extent that Plaintiff Synchronoss' claims are not altogether barred, Synchronoss, by its acquisition of FusionOne, has in effect licensed the Asserted Patents to the Defendants or is contractually required to license the Asserted Patents to the Defendants based on FusionOne's obligations to the OMA.

## FIRST AFFIRMATIVE DEFENSE
### (Invalidity)

52.    Funambol incorporates by reference the foregoing paragraphs of this Answer and Affirmative Defenses.

53.    The claims of the Asserted Patents are invalid for failure to comply with one or more of the requirements of Title 35 of the United States Code, including, but not limited to, Sections 101, 102, 103, 111, 112, 115, 116, and 256.

54.     Indeed, because all three Asserted Patents are directed to abstract ideas that are patent ineligible under current law—ideas like "keeping multiple copies of information up to date"—they are invalid as abstract.

55.     The Supreme Court recently clarified the patent eligibility of software claims in *Alice Corp. Pty. Ltd. v. CLS Bank International*, 134 S. Ct. 2347, 2354 (2014).   The Court set forth a two-part test for determining a patent's subject matter eligibility: (1) determine whether the claims "are directed to [a] patent-ineligible concept[]," and (2) if they are, determine whether they contain "additional elements [that] 'transform the nature of the claim' into a patent-eligible application."  *Alice*, 134 S. Ct. at 2355.   In evaluating whether claims satisfy the second prong, the Court reaffirmed its prior teaching that "[s]imply appending conventional steps, specified at a high level of generality" is not "*enough* to transform an abstract idea into a patent-eligible invention."  *Alice*, 134 S. Ct. at 2357, 2360 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1296–97 (2012)) (emphasis in original).   As a result, claims that recite abstract ideas implemented using conventional or generic computer technologies are not patent eligible.  *Alice*, 134 S. Ct. at 2358.

56.     Additionally, although a presumption of validity attaches to a patent in the context of other invalidity challenge, such as obviousness, "no equivalent presumption of eligibility applies in the Section 101 calculus."  *Ultramercial, Inc.*

*v. Hulu, LLC*, 772 F.3d 709, 721 (Fed. Cir. 2014) (Mayer, J., concurring); *see also OpenTV, Inc. v. Apple, Inc.*, No. 14-cv-01622-HSG, 2015 WL 1535328, at *3 (N.D. Cal. Apr. 6, 2015).

57.    In the wake of *Alice*, courts have invalidated literally thousands of patent claims on the grounds that they are abstract and thus claim ineligible subject matter under Section 101.   *See* Sachs, *Alicestorm: Patent Invalidations and USPTO Practice After Alice* (Jan. 13, 2015).   In December 2014 alone, courts invalidated 858 claims under Section 101.   *Id.*

58.    The Asserted Patents fare no better than those that have fallen under *Alice*.   For instance, the '757 patent is directed to the abstract idea of keeping information up to date in multiple locations.   While the '757 patent couches the functions of the claimed system in computer technology, an abstract idea is not made eligible by limiting the claims to a particular technological environment or by reciting the use of conventional computers to perform conventional steps. *Alice*, 134 S. Ct. at 2358 ("the proposition that the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment.").

59.    Confirming the abstractness of the '757 patent, all of the steps called for in Claim 1 could be performed in a person's mind or with a pen and paper.   *See CyberSource Corp. v. Retail Decisions*, 654 F.3d 1366, 1372 (Fed. Cir. 2011)

(holding claims abstract because they "can be performed in the human mind, or by a human using a pen and paper").  Claim 1 of the '757 patent requires:

> A system for synchronizing data between a first system and a second system, comprising:
>
> a ***first sync engine*** on the first system interfacing with ***data on the first system*** to provide ***difference information in a difference transaction***;
>
> a ***data store*** coupled to the network and in communication with the first and second systems; and
>
> a ***second sync engine*** on the second system coupled to ***receive the difference information*** in the difference transaction from the data store via the network, and interfacing with data on the second system ***to update said data on the second system with said difference information***;
>
> wherein each said sync engine comprises a data interface, a copy of a previous state of said data, and a ***difference transaction generator***.

60.    Each of these steps can be performed using pen, paper, and a human mind.  Using a pen, paper, and her own brain, a person (the "first sync engine" / "difference transaction generator") could analyze "data on a first system" and provide "difference information in a difference transaction."  For instance, if the "data" is a master grocery list to which she added "milk" and "eggs," but struck out "margarine" and "Wonder bread" (while leaving the remaining items unchanged), she could generate a "difference transaction" by writing (on a separate piece of paper): "added milk and eggs; removed margarine and Wonder bread."

She could then place the list of changes (*i.e.*, the "difference transaction") on the refrigerator (*i.e.*, the "data store") for her roommate to retrieve.   Then, her roommate (the "second sync engine") could receive the change list (*i.e.*, the "difference information") from the refrigerator and update *his* version of the master grocery list, which he keeps at work (*i.e.*, the "data on the second system"), with said "difference information" by striking from his version of the master grocery list the "margarine" and "Wonder bread" and adding "milk" and "eggs."

61.   Indeed, that the '757 claims are directed to data generation and manipulation to update existing data confirms that they cover abstract ideas under the first prong of the *Alice* test.   As the Federal Circuit recently emphasized, "[w]ithout additional limitations, a process that employs mathematical algorithms to manipulate existing information to generate additional information is not patent eligible."   *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014).   Claims drawn to data manipulation fall within the "abstract idea" category because they are directed to a fundamentally *human* activity, even if they use a computer, rather than a mental process, to perform that manipulation. *See Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) (explaining that "the interchangeability of certain mental processes and basic digital computation" can "help explain why the use of a computer . . . for no more than its most basic function—making calculations or

computations—fails to circumvent the prohibition against patenting abstract ideas").

62.     The inclusion of generic computer elements (*e.g.*, a "data store," a "network," and an "Internet connection") to perform conventional human activity does not save the '757 patent from being ineligible as abstract.  For example, in *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343 (Fed. Cir. 2014), the Federal Circuit invalidated claims that were "drawn to the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" because "[t]he concept of data collection, recognition, and storage is undisputedly well known.  Indeed, humans have always performed these functions."  *Id.* at 1347.

63.     The second step of the *Alice* framework likewise cannot save the '757 patent because the patent involves no inventive concepts sufficient to transform its abstract idea into a patent-eligible invention.  Regarding this second step, the Supreme Court expressly warned that that "the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment" and held that, for this reason, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention."  *Alice*, 134 S. Ct. at 2358.  Indeed, "[g]iven the ubiquity of computers . . . [a] wholly generic computer implementation is not

generally the sort of 'additional feature' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself.'"   *Id.*   Such "wholly generic computer implementations" are the only things—beside the abstract ideas—recited by the claims of the '757 patent.

64.   In fact, on its face, the '757 patent concedes that it involves no more than a generic computer implementation: it specifically notes that the storage server of the claimed data store may be a "generic storage server." *See* '757 patent at 10:46–48. Figures 7 and 8 further illustrate that generic computer technology is used to implement the abstract idea covered by the claims of the '757 patent. *Id.* at Figs. 7–8.

65.   Claims like the '757 patent's, which simply tack on generic computer elements to abstract ideas, are unpatentable.  In *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013), the Federal Circuit considered related method and system claims and concluded that the system and method claims were both invalid under Section 101, where the hardware required by the system claims did not offer a "meaningful limitation beyond generally linking the use of the method to a particular technological environment, that is, implementation via computers."

66.   Just as in *Guidewire*, the hardware required by the claims of the '757 patent does not provide any meaningful limitation on the abstract idea of updating

data beyond linking it to generic computer components.  This is insufficient to transform the claims into patent-eligible subject matter.  *See, e.g.*, *Open Text S.A. v. Box, Inc.*, No. 13-cv-04910, 2015 WL 269036, at *4–5 (N.D. Cal. Jan. 20, 2015) (rejecting Open Text's assertion that the use of a "server" renders the claim patent eligible).

67.     Likewise, implementing the abstract idea in computer software does not transform the '757 patent's abstract idea into patent-eligible subject matter.  In *CyberSource Corp.*, the Federal Circuit considered a claim to a computer readable medium containing instructions for performing a process (*e.g.*, a flash drive containing compiled code for performing a sequence of steps).  654 F.3d at 1373. The court first held that the process itself was an unpatentable abstract idea because "a method that can be formed by human thought alone is merely an abstract idea and is not patent-eligible under § 101."  *Id.*  The court concluded that tying the process to a computer readable medium (*e.g.*, a flash drive) was insufficient to satisfy Section 101 because the claim still represented an "attempt to capture unpatentable mental processes (*i.e.*, abstract ideas)."  *Id.* at 1376–77. Indeed, the idea that one may not broadly claim the use of a computer to simply replace human activity is one of the core holdings of *Alice*.  *Id.* at 2358; *see also Bancorp Servs.*, 687 F.3d at 1278 ("the fact that the required calculations could be

performed more efficiently via a computer does not materially alter the patent eligibility of the claimed subject matter").

68.     The claims of the '757 patent also fail the Federal Circuit's pre-*Alice* "machine-or-transformation test," which further confirms that they lack the kind of "additional element" that might transform the claim under the second prong of the *Alice* framework.  A claim passes the machine-or-transformation test if it is "tied to a particular machine or apparatus" or "transforms a particular article into a different state or thing."  *See Bilski v. Kappos*, 561 U.S. 593, 602 (2010).  The challenged claims do neither.  As noted previously, the claims do not call for the use of a specific machine, but instead recite, at most, generic computer components.  And the claims are devoid of any "particular article" which might be transformed.  *See CyberSource*, 654 F.3d at 1375 ("The mere manipulation or reorganization of data . . . does not satisfy the transformation prong.").  Thus, insofar as the machine or transformation test provides "a useful and important clue, an investigative tool" for conducting the Section 101 analysis, it too confirms ineligibility.  *See Bilski*, 561 U.S. at 604.

69.     In short, the claims of the '757 patent are directed to an abstract idea—updating data stored in multiple locations—performed using software on generic computer technology.  Therefore, the claims of the '757 patent are directed to patent-ineligible subject matter under 35 U.S.C. § 101 and are thus invalid.

70.    The '696 patent—which issued from a continuation from the parent application of the '757 patent and is also directed to the abstract idea of updating information—fares no better.  As shown above with respect to the '757 patent, the claims of the '696 patent may also be performed using paper, pen, and a human mind.  And, just like the '757 patent, the '696 patent simply calls for the use of conventional data structures and computer hardware; it does not purport to disclose or claim any novel computer hardware.

71.    The '446 patent is likewise directed to the abstract idea of updating data maintained in different locations, but the "data" of the '446 patent is "media" (*i.e.*, audio or video).  But the "prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment," *e.g.*, audiovisual technology.  Because the claims of the '446 patent simply require storing data, generating updates to the data, and sending those updates, they, too, are patent ineligible.  *See Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014) ("Without additional limitations, a process that employs mathematical algorithms to manipulate existing information to generate additional information is not patent eligible.").

## SECOND AFFIRMATIVE DEFENSE
### (Laches)

72.     Funambol incorporates by reference the foregoing paragraphs of this Answer and Affirmative Defenses.

73.     Synchronoss' claims for pre-suit damages for infringement of the Asserted Patents are barred by the doctrine of laches.

74.     As an assignee of FusionOne's patents, Synchronoss is held to the dilatory conduct of its predecessor-in-interest to the Asserted Patents, FusionOne. *See Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1559 (Fed. Cir. 1997) ("A patentee cannot avoid the consequences of his laches by transferring the patent.") (citing *Cont'l Coatings Corp. v. Metco, Inc.*, 464 F.2d 1375, 1377 (7th Cir. 1972) ("plaintiff must accept the consequences of [its predecessor's] dilatory conduct")).

75.     As documented above, FusionOne (and thus Synchronoss) knew that Funambol was selling personal cloud technology that Synchronoss claims practice the '446 patent by no later than September 2009.  *See supra* ¶¶ 35–36.

76.     Then, over a nearly five-year period, until Synchronoss filed this suit, FusionOne and Synchronoss slept on their rights to the '446 patent.  At no point during this timeframe did FusionOne or Synchronoss indicate that they would assert the '446 patent against Funambol.  On the contrary, when Funambol requested that FusionOne identify any of its intellectual property that may be

relevant to Funambol, FusionOne identified other patents, but not the '446 patent. *See supra* ¶ 36.

77.     Likewise, by no later than March 3, 2010, FusionOne (and thus Synchronoss) knew that Funambol was selling personal cloud technology that Synchronoss claims practice the '757 and '696 patents.   *See supra* ¶¶ 37–41. Nevertheless, over a four and a half year period, until Synchronoss filed this suit, FusionOne and Synchronoss slept on their rights in to the '757 and '696 patents. During this timeframe, neither FusionOne nor Synchronoss ever indicated that it would assert the '757 or '696 patents against Funambol.   Indeed, Funambol expressly informed FusionOne that, if it could not back up its infringement assertion, Funambol would have to "assume that [FusionOne's] allegations lack merit."  When FusionOne (and therefore Synchronoss) refused to respond, the only reasonable conclusion was that FusionOne had determined that its claims lacked merit.   Moreover, Synchronoss subsequently ***paid Funambol*** for the use of the very technology it now accuses of infringement. *See supra* ¶¶ 42–47; *infra* ¶¶ 81–85.  FusionOne's refusal to back up its infringement assertions, coupled with Synchronoss' 2012 request to license the accused technology from Funambol, gave Funambol complete assurance that Synchronoss never intended to sue.

78.     FusionOne's and Synchronoss' delay in filing suit was highly prejudicial to Funambol.   During this delay, Funambol invested significant

resources to expand its personal cloud technology and has entered into numerous long-term supply arrangements based on its presumed rights to be free from suit under the Asserted Patents.  Indeed, since early 2012, Funambol has released ten additional versions of its OneMediaHub product.  Funambol has thereby steadily, and substantially, built upon the same core synchronization functionality that FusionOne accused back in 2010 (before withdrawing its assertions), and that Synchronoss became intimately familiar with when it licensed Funambol's OneMediaHub product in 2012.  To develop these releases, Funambol has invested tens of thousands of personnel hours to improve upon, and add to, OneMediaHub's features and functionality.  During the period of Synchronoss' silence, Funambol also expanded into new markets and signed long-term supply agreements with numerous top-tier wireless carriers, including Orange Group headquartered in France, EPlus Group in Germany, Telefónica in Spain, Turkcell in Turkey, TIM in Brazil, and LIME in the Caribbean.  Collectively, these new agreements expanded Funambol's OneMediaHub offering to nearly half-a-billion additional addressable end-users.

79.    Additionally, on information and belief, evidence critical to issues of noninfringement, unenforceability, and damages has been lost or destroyed, which has materially prejudiced Funambol's ability to defend against Synchronoss' infringement allegations.

80.    Synchronoss' delay in filing suit was unreasonable and inexcusable under the circumstances.  And Funambol knows of no excuse for this delay.

### THIRD AFFIRMATIVE DEFENSE
### (Authority to Practice / Implied License / Acquiescence)

81.    Funambol incorporates by reference the foregoing paragraphs of this Answer and Affirmative Defenses.

82.    For more than four years before it brought suit on the Asserted Patents against Funambol, Synchronoss well knew that Funambol was making, using, and selling the personal cloud technology that Synchronoss now claims practices the Asserted Patents.  *See supra ¶¶* 35–41.

83.    In fact, during this period, Synchronoss engaged Funambol to develop for Synchronoss software containing personal cloud technology that Synchronoss now claims practices the Asserted Patents for Synchronoss to resell to Synchronoss' customers.  *See supra ¶¶* 42–47.

84.    Synchronoss paid Funambol $500,000 upfront for this software and promised millions of dollars in revenue sharing.  (The vast majority of the promised revenue share was never paid because, after Synchronoss won a large contract by showcasing Funambol's software, Synchronoss then abandoned Funambol's software by, on information and belief, acquiring another competitor and redesigning its software to copy the functionality and distinctive look-and-feel, of Funambol's software.)  Although it paid Funambol hundreds of thousands of

dollars (and promised millions more) to use Funambol's personal cloud technology, at no point did Synchronoss allege that Funambol's technology may infringe Synchronoss' patents.

85.    Based on Synchronoss' conduct, Funambol reasonably inferred that Synchronoss consented to its development and sales of products that Synchronoss now claims infringe the Asserted Patents, and Funambol relied on Synchronoss' failure to assert those patents in developing and selling such products. *See supra* ¶ 78.

## FOURTH AFFIRMATIVE DEFENSE
### (Equitable Estoppel)

86.    Funambol incorporates by reference the foregoing paragraphs of this Answer and Affirmative Defenses.

87.    Synchronoss' claims are barred by the doctrine of equitable estoppel.

88.    As documented above, despite knowing of Funambol's allegedly infringing activity for more than four years, Synchronoss (and its predecessor, FusionOne) unreasonably and inexcusably delayed in bringing this suit, and that delay materially prejudiced Funambol. *See supra* ¶¶ 35–47, 78.

89.    Further, through its conduct (including that of FusionOne), Synchronoss induced Funambol to believe that Synchronoss had abandoned its claims against Funambol.  Indeed, during this timeframe, Synchronoss ***paid***

*Funambol* for the use of the very technology it now accuses of infringement.  *See supra* ¶¶ 42–47.

90.    In reliance on Synchronoss' conduct (including the conduct of FusionOne attributable to Synchronoss), Funambol invested significant resources to expand its personal cloud technology and has entered into numerous long-term supply arrangements based on its presumed rights to be free from suit under the Asserted Patents.  *See supra* ¶ 78.

91.    Consequently, Funambol would be materially prejudiced if Synchronoss were now permitted to proceed with this suit.

## FIFTH AFFIRMATIVE DEFENSE
### (Promissory Estoppel / Implied License)

92.    Funambol incorporates by reference the foregoing paragraphs of this Answer and Affirmative Defenses.

93.    One or more of the Asserted Patents are unenforceable against Funambol by the doctrines of promissory estoppel and/or implied license by virtue of FusionOne's (and, thus, Synchronoss') breach of its obligations to standard setting organizations, including the SyncML initiative and/or the OMA.

## INDUSTRY STANDARDS AND PATENT HOLDUP

94.    To facilitate interoperability among the cellular networks and various mobile devices, mobile network operators, mobile device manufacturers, and synchronization service providers, among others, participate in the development of

industry technical standards that establish precise specifications for the important components of the technology.  Once these standards are established, competing manufacturers and service providers can offer their own products and services that are compliant—and thus compatible with—the standards.

95.    Standards development also reduces costs for both suppliers and consumers.  For suppliers, standardization reduces the need in many instances to develop products to a particular purchaser's specifications.  Accordingly, because a single product or product line may be sold to multiple purchasers and distributed more widely, manufacturing volumes increase and per unit costs decrease. Consumers benefit from increased price competition among suppliers.  Because many suppliers make standards-compliant products, switching suppliers typically does not require a substantial redesign of one's products or a substantial technical transfer to enable the new supplier to produce compatible products.  The lower "switching cost" intensifies competition among suppliers, leading to lower prices.

96.    On the other hand, technical standardization also creates a "lock-in" effect and the risk of "patent hold-up."  Although standards are the products of coordination and compromise among competitors, certain aspects of standards may be—and often are—covered by patents.  Before standardization, the royalty a patentee can earn from a patent license for its technology is constrained in part by the availability of alternative technical approaches to perform that function.

Conversely, when a standard requires a supplier to employ a patented technology, other technological approaches are no longer available substitutes, and the patentee's ability to demand royalties far in excess of what is warranted by the intrinsic value of the technology is no longer constrained.

97.    This phenomenon is compounded because suppliers, such as Funambol, invest great resources developing innovative, new products, product features, and services that also comply with the technical standard.  Even if there were an alternative standard, the costs and disruption associated with switching is typically prohibitively expensive.  The supplier that implements a standard thus becomes "locked-in."   Because a supplier cannot readily switch the standard practiced by its products/services, the ability of end consumers to choose among software that practices different standards cannot mitigate the lock-in effect.  Thus, left unconstrained, owners of patents that purportedly cover certain features within the standard can take advantage of lock-in and demand exorbitant royalties and other terms from the suppliers, knowing that it would be less costly for the supplier to pay the excessive royalty or capitulate to unreasonable terms rather than incur the cost of switching.  This dynamic is often called "patent hold-up."

98.    Accordingly, most standard setting organizations ("SSOs") have adopted intellectual property rights ("IPR") policies to address the problem of patent hold-up.  These policies set forth requirements concerning, among other

things: (a) timely disclosure of IPR that may claim any portion of the specifications of the standard in development; and (b) whether and to what extent parties holding purported essential IPR must commit to licensing these IPR on Fair, Reasonable, and Non-Discriminatory ("FRAND") terms and conditions.

99.     Timely disclosure of purportedly essential IPR is critical to ensuring that those participating in standards development can evaluate technical proposals with knowledge of the potential licensing costs that suppliers may incur when developing standards-compliant products and services.

100.    FRAND commitments, in turn, grant implementers the right to practice claimed essential patents and preclude parties making FRAND commitments from seeking to enjoin parties from practicing the relevant standard—*i.e.*, where a party has committed to license its IPR on FRAND terms, that party cannot ask a court to halt infringement that results from practicing the standard; instead, the party must license the infringer's use of the technology in exchange for a "fair and reasonable" license fee.  Participants in standards development rely on these contractual commitments to ensure that IPR holders seeking to extract unreasonable royalties and terms from those implementing the standard will not hinder the widespread adoption of the standard.  As set forth in greater detail below, the IPR policies at issue here require participants claiming to own essential IPR to commit to license those IPR on FRAND terms.

101.   Breaching FRAND commitments undermines the safeguards that SSOs put in place to prevent abuse.   By seeking to unfairly exploit a patent's actual or purported incorporation into a standard, the patentee violates the very commitment that led to incorporation of that technology in the first place.

### THE SYNCML DATA SYNCHRONIZATION STANDARD

102.   In the early 2000s, several key industry players—including IBM, Microsoft, Motorola, Nokia, and Palm—founded the SyncML Initiative to produce an open specification for data synchronization.   Prior to SyncML, data synchronization had been based on a set of different, proprietary protocols, each functioning only with a very limited number of devices, systems and data types. These non-interoperable technologies complicated the tasks of users, manufacturers, service providers, and developers.   Further, the proliferation of different, proprietary data synchronization and device management protocols created barriers to the extended use of mobile devices, has restricted data access and delivery and limited the mobility of the users.

103.   To combat this fragmentation, the SyncML Initiative developed an open standard that specifies particular protocols for data synchronization, including how SyncML messages conforming to the standard must be exchanged in order to allow a SyncML client and server to exchange additions, deletes, updates and other status information.

104.   By late 2001, SyncML had become the leading open industry specification for universal data synchronization of remote data and personal information across multiple networks, platforms and devices, with more than 650 sponsors in the wireless (and related) industries.

105.   In late 2003, the SyncML Initiative was consolidated with the OMA. The OMA, which was formed in June 2002, is a non-profit organization that delivers open specifications for creating interoperable services that work across a broad array of mobile networks and devices.  As a result of the consolidation, the OMA adopted the SyncML Initiative's standards for data synchronization.

106.   To facilitate its standard setting activity, the OMA has an IPR, which is set forth in the OMA's IPR Procedural Guidelines for OMA Members ("IPR Guidelines").  Under Section 3.2 of these IPR guidelines, OMA members agree to use reasonable efforts to timely inform the OMA of any IPR essential to the OMA's standards, including the SyncML standards:

> Each Open Mobile Alliance member has agreed to use reasonable endeavors to inform the Open Mobile Alliance in a timely manner of Essential IPR as it becomes aware that the Essential IPR is related to the prepared or published specification.

107.   The OMA's IPR policies further require that:

> A Member shall immediately notify the Open Mobile Alliance if it or one of its Affiliates is not prepared to license an Essential IPR and shall, upon request from the Open Mobile Alliance, provide a written explanation of

the reasons for refusing to license such Essential IPR
within ninety (90) days of receipt of such request.

108. Additionally, as a prerequisite to OMA membership, all members
agree to license their standard-essential IPR on FRAND terms.

109. On information and belief, FusionOne was, at all relevant times, an
OMA member.

110. On information and belief, as part of the consolidation between the
SyncML Initiative and the OMA, FusionOne entered into an agreement ("the
OMA Agreement") wherein FusionOne was required to notify the OMA in writing
of all of FusionOne's IPR, including patent applications, that were essential ("the
Essential IP") to practicing any standards or specifications being considered by the
OMA, including the OMA's SyncML data synchronization standard.

111. Upon information and belief, pursuant to the OMA Agreement,
FusionOne agreed not to make any claims, actions, or demands—*e.g.*, filing this
lawsuit—against any other member of the OMA or party associated with the
OMA in relation to another member's use of the Essential IP if that member is
willing to license the Essential IP under FRAND.

112. Upon information and belief, pursuant to the OMA Agreement,
FusionOne agreed not to make any claims, actions, or demands—*e.g.*, filing this
lawsuit—against any other member of the OMA or party associated with the
OMA in relation to another member's use of the Essential IP, under any

circumstances, if FusionOne had not disclosed the Essential IP to the OMA in writing.

113.   On information and belief, FusionOne never disclosed in writing any of the Asserted Patents during the standard-setting process in breach of FusionOne's commitments to the OMA.

114.   On information and belief, FusionOne's deliberate failures to disclose the Asserted Patents and its unwillingness to offer FRAND terms, were intended to, and did, cause the OMA to incorporate into its SyncML standard technology that Synchronoss now claims is covered by the Asserted Patents.

115.   On information and belief, had FusionOne timely disclosed that it had relevant IPR that it would not offer on FRAND terms to all those implementing the SyncML standard, the OMA would have decided to standardize an alternative technology to perform the relevant function.  On information and belief, the OMA alternatively would have continued to leave the relevant functionality out of the standard, in which case implementers would have been free to choose various alternative technologies to perform that function.

116.   Synchronoss, by its acquisition of FusionOne, is barred from asserting any claims against Funambol based on the Asserted Patents—including the patent infringement claims in its Complaint—based on FusionOne's failure to disclose

and notify the OMA, in writing (and through it, the members of the OMA), of the Asserted Patents.

117.   To the extent that Plaintiff Synchronoss' claims are not barred, Synchronoss, by its acquisition of FusionOne, has in effect licensed the Asserted Patents to the Defendants or is contractually obligated to license the Asserted Patents to the Defendants upon request at least by virtue of Synchronoss' obligations pursuant to the OMA.

118.   Synchronoss, as a successor to FusionOne, is barred from asserting any claims of the Asserted Patents against the Defendants based on the Asserted Patents—including the patent infringement claims in its Complaint—because FusionOne breached its mandatory duty to disclose of the Asserted Patents pursuant to FusionOne's duties to the OMA.

## SIXTH AFFIRMATIVE DEFENSE
### (FRAND License)

119.   Funambol incorporates by reference the foregoing paragraphs of this Answer and Affirmative Defenses.

120.   To the extent that the Asserted Patents are essential to any OMA standard and to the extent any of the alleged inventions described in and allegedly covered by the Asserted Patents are used or sold by or for Funambol, its suppliers, and/or its customers (or its customers' customers), Funambol is licensed to the Asserted Patents pursuant to Synchronoss' commitments to license its Asserted

Patents on FRAND terms; or, in the alternative, Funambol has the irrevocable right to be licensed on FRAND terms under those patents.

## SEVENTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

121.   Funambol incorporates by reference the foregoing paragraphs of this Answer and Affirmative Defenses.

122.   Synchronoss' claims to equitable relief are barred by unclean hands based on its knowing assertion of legally- and equitably-barred patent infringement claims.

## EIGHTH AFFIRMATIVE DEFENSE
### (Failure to Mark)

123.   Funambol incorporates by reference the foregoing paragraphs of this Answer and Affirmative Defenses.

124.   Synchronoss' claims are barred in whole or in part by its failure to provide adequate notice under 35 U.S.C. § 287.

125.   In particular, on information and belief, Synchronoss has settled multiple lawsuits in which it alleged infringement of one or more of the Asserted Patents. *See, e.g.*, Stipulation of Dismissal, *Synchronoss Techs., Inc. v. Dashwire, Inc.*, No. 11-cv-02 (W.D. Wis. Aug. 2, 2011), ECF No. 28 (documenting the parties' agreed motion to dismiss "all claims and counterclaims in this action with prejudice").

126.   On information and belief, one or more of these settled lawsuits have resulted in the defendants in those actions taking a license to the Asserted Patents with respect to the products accused of infringement.

127.   On information and belief, these licensees of the Asserted Patents have failed to adequately mark the products covered by the license with the patent numbers of the Asserted Patents.

128.   Consequently, on information and belief, Synchronoss has failed to adequately enforce/adequately ensure compliance of its licensees' marking of the patent numbers of the Asserted Patents on the licensees' products.

## NINTH AFFIRMATIVE DEFENSE
### (Noninfringement)

129.   Funambol incorporates by reference the foregoing paragraphs of this Answer and Affirmative Defenses.

130.   Funambol has not infringed and does not infringe, either literally or by the doctrine of equivalents, any valid and enforceable claim of the Asserted Patents.

## TENTH AFFIRMATIVE DEFENSE
### (Prosecution History Estoppel / Disclaimer)

131.   Funambol incorporates by reference the foregoing paragraphs of this Answer and Affirmative Defenses.

132.  By virtue of the proceedings in the United States Patent and Trademark Office, including the prosecution of the applications that resulted in the Asserted Patents, Synchronoss is estopped from construing one or more claims of the Asserted Patents to cover and include any product, service, or activity of Funambol and/or is prevented from asserting infringement under the doctrine of equivalents.

**ELEVENTH AFFIRMATIVE DEFENSE**
**(No Right to Injunctive Relief)**

133.  Funambol incorporates by reference the foregoing paragraphs of this Answer and Affirmative Defenses.

134.  Synchronoss has no right to injunctive relief because: (a) it cannot demonstrate irreparable harm; (b) legal remedies, such as monetary damages, are sufficient to compensate for any alleged injury to Synchronoss; (c) the balance of the hardships do not favor entry of an injunction; and (d) the public interest would not be served by an injunction.

135.  With respect to irreparable harm, Synchronoss cannot make the requisite showing because, on information and belief, Synchronoss has demonstrated its willingness to forego its patent rights in exchange for compensation by settling lawsuits involving the Asserted Patents.

136.  And, significantly, despite knowing of Funambol's allegedly infringing activities since as early as 2009, Synchronoss and its predecessor-in-

interest to the Asserted Patents permitted Funambol to continue those activities rather than seek an injunction barring those activities.

137.   Synchronoss similarly cannot demonstrate that legal remedies, such as monetary damages, are inadequate.  At the outset, Synchronoss has demonstrated the adequacy of monetary damages by, on information and belief, agreeing to forego its patent rights in exchange for financial compensation when it settled prior lawsuits involving the Asserted Patents.

138.   Additionally, the balance of the hardships does not favor an injunction.  With a market capitalization of over $2 billion, Synchronoss is many times larger than Funambol, and, on information and belief, the technology of the Asserted Patents is relevant to just one of Synchronoss' many offerings.  Thus, on information and belief, there is no risk that Synchronoss will suffer a cognizable level of hardship if an injunction is denied (as confirmed by its failure, and FusionOne's, to seek an injunction despite knowing of Funambol's allegedly infringing activities since at least September 2009).

139.   Further, seeking injunctive relief is contrary to FusionOne's commitments to the OMA—commitments Synchronoss is now obligated to maintain through its acquisition of FusionOne—to license the Asserted Patents on FRAND terms and Funambol's resulting license or, in the alternative, irrevocable right to obtain a license by virtue of FusionOne's FRAND commitments.

140.   Finally, Synchronoss is barred from obtaining equitable relief because it has come to this Court with unclean hands, as documented above in ¶¶ 121–122.

## TWELFTH AFFIRMATIVE DEFENSE
### (Limitation on Damages)

141.   Funambol incorporates by reference the foregoing paragraphs of this Answer and Affirmative Defenses.

142.   Synchronoss' claim for damages is barred, in whole or in part, by 35 U.S.C. §§ 286 and/or 287(a) as a result of its failure to mark and/or the passage of time.  Synchronoss' ability to recover costs is barred by 35 U.S.C. § 288.

## <u>RESERVATION OF RIGHT TO ASSERT OTHER DEFENSES</u>

Defendant reserves the right to assert any other defenses that discovery may reveal.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Funambol hereby demands a trial by jury in this action.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Funambol prays for the following relief:

a.   Judgment that none of the claims of the asserted patents have been infringed by Funambol either literally or under the doctrine of equivalents;

b.      Judgment that Synchronoss' Complaint be dismissed with prejudice, that each request for relief therein be denied, and that Synchronoss recover nothing;

c.      Judgment that the Asserted Patents are invalid and/or unenforceable;

d.      An order, pursuant to 35 U.S.C. § 285 finding that this is an "exceptional" case and awarding Funambol its reasonable attorneys' fees, expenses, and costs incurred with this action;

e.      An order denying Synchronoss any recovery of costs; and

f.      An order awarding Funambol such other and further relief as this Court deems just and proper.

Dated:  June 12, 2015          Respectfully submitted,

SCHNADER HARRISON SEGAL & LEWIS LLP

By: _ */s/ Lisa J. Rodriguez* _____
LISA J. RODRIGUEZ
ljrodriguez@schnader.com
Woodland Falls Corporate Park
220 Lake Drive East, Suite 200
Cherry Hill, New Jersey 08002-1165
Telephone: (856) 482-5741

DURIE TANGRI LLP
SONALI D. MAITRA (*Pro Hac Vice to be filed*)
smaitra@durietangri.com
TIMOTHY C. SAULSBURY (*Pro Hac Vice to be filed*)
tsaulsbury@durietangri.com
217 Leidesdorff Street
San Francisco, CA 94111
Telephone: (415) 362-6666
Facsimile: (415) 236-6300

Attorneys for Defendant
FUNAMBOL, INC.

## <u>CERTIFICATE OF SERVICE</u>

I certify that all counsel of record is being served on June 12, 2015 with a copy of this document via the Court's CM/ECF system.

*/s/ Lisa J. Rodriguez*
LISA J. RODRIGUEZ
